87 N.J. Super. 216 (1965)
208 A.2d 803
PAUL R. KLEINBERG, ETC., PLAINTIFF-RESPONDENT,
v.
ARTHUR SCHWARTZ, ET AL., DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued February 1, 1965.
Decided April 5, 1965.
*218 Before Judges CONFORD, KILKENNY and LEWIS.
Mr. Howard T. Rosen argued the cause for appellant (Messrs. Clapp & Eisenberg, attorneys; Mr. Jerome C. Eisenberg, of counsel, Mr. Arnold K. Mytelka, on the brief).
Mr. Jack L. Cohen argued the cause for respondent.
The opinion of the court was delivered by KILKENNY, J.A.D.
After a plenary trial in the Chancery Division, a final judgment was entered against defendant Charles Schwartz (hereinafter "Charles") alone for the sum of $46,127.21 and in favor of plaintiff, as assignee for the benefit of creditors of Roger's Outfitters, a New Jersey corporation (hereinafter "Outfitters"). The other defendants were not served in the action. Charles appeals from the judgment.
The trial court found that Outfitters had purchased its own shares of stock from Charles, one of its stockholders and a former director, and in paying therefor had invaded the capital of the corporation to the extent of $46,127.21, without having complied with the requirements of R.S. 14:11-5.
R.S. 14:11-5 provides that if a corporation buys its own shares of stock and uses the capital of the corporation, as distinguished from its surplus, to pay for those shares, it must retire the purchased shares and publicize the fact that its capital has been thus reduced by filing a written certificate of reduction of capital in the office of the Secretary of State and *219 publishing the same for three weeks successively, at least once in each week, in a newspaper published in the county in which the principal office of the corporation is located. "In default of such publication when so required the directors of the corporation shall be jointly and severally liable for all debts of the corporation contracted before the filing of the certificate, and the stockholders shall also be liable for such sums as they may respectively receive of the amount so reduced."
A corporation may purchase its own shares of stock and pay therefor out of surplus. The purchased shares then become treasury stock and may be reissued. When payment is made out of surplus, it is not necessary to file and publish a certificate of reduction of capital as in the case where capital is used by a corporation to purchase its own shares.
It is conceded that a certificate, such as that required by R.S. 14:11-5, was not filed or published by Outfitters. If, therefore, Outfitters purchased its own shares of stock from Charles by the use of capital, then Charles would be subject to the legal consequences, as defined in this statute.
In seeking a reversal Charles contends: (1) Outfitters was not the purchaser of his shares in that corporation, but his brother Arthur was; and (2) payments for his shares were not made out of the capital of Outfitters but out of surplus, or out of loans made by Outfitters to Arthur's corporate nominee and offset by loans made by Arthur to Outfitters.

I.
The evidence supports the finding by the trial court that Outfitters was the actual purchaser of Charles' shares, regardless of the form used to screen the real transaction.
Arthur, Charles and their father, Nathan, each owned a one-third stock interest in Outfitters, a family corporation operated by them and organized in 1953. A lack of family harmony resulted in a decision that Charles and Nathan would leave the firm and Arthur alone would remain. Charles and Nathan were each to be paid $152,532 for their respective *220 stock interests in the corporation. The payments were to be made at the rate of $500 weekly (without interest). This was the same amount as had previously been drawn weekly as salary by both Charles and Nathan from this family corporation. There was ample evidence to justify the trial court's finding that the parties anticipated that the payments for the shares would come from the funds of Outfitters.
The parties consulted their respective attorneys and accountants. Arthur's attorney drew an agreement for the purchase of the shares of Charles and Nathan. Outfitters was named therein as the purchaser. Counsel for Charles and Nathan disapproved the form of the agreement because no audit had been made of the financial affairs of Outfitters and fear was expressed as to the possible consequences of a corporation's buying its own shares. Arthur's financial advisers did not want Arthur named as the purchaser because of the income tax consequences of his drawing $1,000 weekly from Outfitters to pay his brother and father, besides his own salary.
Faced with this concern as to the legal and tax consequences of using Outfitters' funds to purchase its shares of stock held by Charles and Nathan, the parties adopted the following form of agreement. They designated as purchaser of the shares of Charles and Nathan an inactive corporation, which the three of them had formed in 1953, named Rogers Credit Department Stores (hereinafter "Credit"). This was a mere paper corporation, without any assets, bank account or business activity. Its corporate franchise tax returns always listed it as "inactive." All parties knew that Credit had no financial means to pay for the shares of stock. Yet, an agreement of purchase was executed on November 17, 1955 between Charles and Nathan as sellers and Credit as purchaser. Arthur and his wife signed as guarantors of performance by Credit. The agreement provided for deposit of the shares with the attorneys to be held in escrow, with delivery on performance, or a right to retake the shares and resell in the event of default.
*221 All payments on account of the purchase of the shares came thereafter from the funds of Outfitters. From November 1, 1955 to about July 1956 the payments of $500 weekly to Charles and Nathan were in the form of checks drawn by Outfitters directly to the order of Charles and Nathan, respectively. From July 1956 to the time of the last payment on February 12, 1959 Outfitters' checks for this purpose were made payable to the order of Credit and were then deposited in a checking account which had been opened in June 1956 in Credit's name solely for the purpose of acting as a conduit for transmittal of checks of equal amount issued in the name of Credit as drawer to the order of Charles, in payment for his shares. This new setup was contemporaneous with the death of Nathan and a change of accountants by Outfitters.
This new procedure included the last payment to Charles in 1959, when Outfitters issued its check to Credit for $39,000, which Credit deposited in its account, after which Credit issued its check to Charles for $39,000. This payment represented the full balance of the purchase price receivable by Charles and was made under a prepayment discount provision in the agreement. Credit closed its checking account on March 4, 1959, after this last check cleared. The remaining balance of $121.92 in the account was transferred to Outfitters.
The expenditures of Outfitters' funds in satisfaction of the purchase price of the shares were reflected in different forms on the books and in the records of the company, depending upon who acted as accountant at the particular time. In the beginning, the bookkeeper for Outfitters entered the $500 weekly payments in Outfitters' books with the notations "stock purchase" or "re-purchase of stock." An existing account payable to Arthur on the books of the company was, during that period, reduced by the amount of these $500 payments. From July 1956 on, the book entries reflected the checks payable to Credit as an account receivable from Credit, without any diminution bookwise in the account payable to Arthur. There was some testimony that Credit was also *222 charged bookwise with the payments originally made directly by Outfitters to Charles and Nathan, and this sum was added back to the amount "due to stockholders" (Arthur), which had previously been reduced.
There were testimony and notations in the records that Outfitters held an informal option to purchase the shares of Charles and Nathan, and the trial court found that to be a fact.
Despite the forms in which the parties cast the transaction, the bald fact remains that Outfitters' money was the sole means actually employed to buy back its own shares from Charles and Nathan. Charles and the others knew that Outfitters was the contemplated source of payment. This knowledge was confirmed when Charles accepted Outfitters' checks directly for several months after the agreement. He was also aware that Credit was only an empty shell, a mere conduit for disbursement of Outfitters' funds. Charles conceded on appeal that Credit was not the real purchaser but he argues that Arthur was the purchaser. However, as Charles knew, Arthur strenuously opposed casting himself in any such role, after it was suggested that he, rather than Outfitters, be named as purchaser.
Equity looks to the substance rather than the form. Fortugno v. Hudson Manure Co., 51 N.J. Super. 482 (App. Div. 1958); Adolph Gottscho, Inc. v. American Marking Corp., 26 N.J. 229 (1958). The same approach should be taken to effectuate the underlying policy of the statute, which is regulatory in nature. In substance, Outfitters purchased the shares. Even the attorney who represented Charles and Nathan at the time the agreement was made frankly admitted in his testimony that he was "worried" about the final form of the transaction, but he and his clients "took the calculated risk and went along on that basis." He explained that the calculated risk was that Outfitters would continue to flourish and "there would be sufficient surplus."
The persuasive factor herein is that Outfitters' money was used without any reasonable expectation that Outfitters would *223 ever get anything in exchange therefor except the shares of Charles and Nathan. Carrying the payments on its books as as account receivable from Credit, a worthless corporation, was a pure bookkeeping fiction. Credit never repaid Outfitters. Realistically, therefore, Outfitters purchased its own shares from Charles with its own funds, despite the bookkeeping technique used to mask the true situation.

II.
The trial court found that, in the purchase of Charles' shares, Outfitters had impaired its capital to the extent of $46,127.21. The evidence supports that finding.
Charles contends that impairment of capital must be determined as of the time the agreement of purchase was made in 1955, and not as of the time the payments were actually made under the agreement. Even were we to look at Outfitters' financial picture at that time, its December 31, 1955 balance sheet, the one closest in time to the November 17, 1955 agreement, showed a surplus of $259,614, but the total purchase price of the shares of Charles and Nathan amounted to $305,064.
We do not regard the date of the agreement as controlling herein. Rather, the time of payment is the dominant factor. The capital of a corporation is a "trust fund" and the directors, as trustees thereof, may not dispose of it to the prejudice of creditors without an equivalent consideration, and no stockholder is entitled to any share of it until all the debts are paid. Williams v. Boice, 38 N.J. Eq. 364, 367-369 (Ch. 1884); Whitfield v. Kern, 122 N.J. Eq. 332, 343 (E. & A. 1937); Merola v. Fair Lawn Newspaper Printing Corp., 135 N.J. Eq. 152 (E. & A. 1944); King Machine Co. v. Caporaso, 2 N.J. Super. 230, 235 (Ch. Div. 1949).
A stockholder who sells his shares to the issuing corporation on a deferred payment plan assumes the risk that at the time payment is made the corporation may not then have sufficient surplus out of which to make the payment. The authorities *224 seem to be unanimous in holding that the fact that the corporation had a surplus when the agreement to purchase was made is not sufficient to defeat the rights of creditors of the corporation, if it does not have a surplus at the time the payments are actually made. Berger v. U.S. Steel Corporation, 63 N.J. Eq. 809, 817 (E. & A. 1902); Hoover Steel Ball Co. v. Schafer B.B. Co., 90 N.J. Eq. 164 (Ch. 1919); Boggs v. Fleming, 66 F.2d 859 (4 Cir. 1933); Iback v. Electric Supp. Co., 118 N.J. Eq. 90 (Ch. 1935); Topken, Loring & Schwartz, Inc. v. Schwartz, 249 N.Y. 206, 163 N.E. 735 (N.Y. Ct. App. 1928); Robinson v. Wangemann, 75 F.2d 756 (5 Cir. 1935); In re Bell Tone Records, Inc., 86 F. Supp. 806, 810 (D.C.N.J. 1949); Mountain State Steel Foundry, Inc. v. C.I.R., 284 F.2d 737, 742 (4 Cir. 1960); 1 Cook on Corporations (7th ed.), par. 9.
Charles relies upon Wolff v. Heidritter Lumber Company, 112 N.J. Eq. 34 (Ch. 1932), and Fox v. Radel Leather Manufacturing Company, 121 N.J. Eq. 291 (E. & A. 1937), to support his contention that, if the corporation has a surplus at the time of the agreement to buy its own shares, it is not necessary that it have a surplus at the time of the actual payment. Those cases are inapposite. They were concerned with the issue of whether the unpaid stockholder could claim the status of a creditor of the corporation. The issue before us is the right to recover on behalf of creditors money paid by the corporation to one of its stockholders out of capital for its own shares, without complying with R.S. 14:11-5.
R.S. 14:11-5 does not precondition the stockholder's liability to repay upon actual knowledge by him that the capital of the corporation is being invaded to make the payments. The statute states unequivocally:
"* * * and the stockholders shall also be liable for such sums as they may respectively receive of the amount so reduced."
The good faith of a stockholder or his ignorance of the source of payment is no defense to an action for recovery from him *225 of such funds as he may have received as the result of an impairment of the capital of the corporation, without compliance with the statutory requirements. Detroit Trust Co. v. Goodrich, 175 Mich. 168, 141 N.W. 882 (Mich. Sup. Ct. 1913); Powers v. Heggie, 268 Mass. 233, 167 N.E. 314 (Mass. Sup. Jud. Ct. 1929); Taylor v. Spurway, 16 F. Supp. 566 (S.D. Fla. 1936), reversed on other grounds Bancroft v. Taylor, 91 F.2d 579 (5 Cir. 1937). Innocent though they may be, stockholders "cannot become bona fide purchasers of corporate property or funds transferred to them to the prejudice of creditors in payment for their own stock." Taylor v. Spurway, supra, 16 F. Supp., at p. 573.
There may be a recovery against a stockholder where capital of the corporation is paid to him for his shares, without complying with R.S. 14:11-5, not only on behalf of creditors existing at the time of such payment but also on behalf of all who become creditors after this reduction of capital and before compliance with the statute. This is because future creditors are presumedly led to believe, in the absence of the filing and publishing of a certificate of reduction of capital, that the capital has not been impaired by payments to stockholders for their shares. Williams v. Boice, supra, 38 N.J. Eq., at p. 370; Whitfield v. Kern, supra, 122 N.J. Eq., at p. 344.
Charles contends that the trial court did not take into consideration that real estate owned by Outfitters had been reappraised as of June 1959 and the reappraisal showed an increase in value therefor. This contention was not argued before the trial court. As plaintiff points out, if such an argument had been made, plaintiff would have had the right to produce evidence  and asserts that he would have been able to do so  showing that the value of the real estate in June 1959 was not in excess of the value assigned to it in Outfitters' balance sheet of February 1959, when the $39,000 final payment was made to Charles. As noted in Mountain State Foundry, Inc. v. C.I.R., supra:
*226 "Write ups by appraisal are frequently suspect. As a practice they are now usually frowned upon. The suggestion is startling that such a ministerial act, which alters the real situation not in the least, could enlarge corporate power to purchase its [own] stock." (284 F.2d, at p. 741)
Not having urged the matter before the trial court and thus having induced plaintiff not to present contrary evidence, Charles may not now advance this contention to show that there was not an impairment of capital when the payments were made.
Charles also claims error in the failure of the trial court to reduce the amount of capital impairment of Outfitters ($70,022.69) by the amount owed by Outfitters to Arthur Schwartz ($62,970.19), which, if done, would reduce the net capital impairment to only $7,052.50. He takes this position because, in determining the net worth of the corporation, the trial court disallowed the book account receivable from Credit in the sum of $144,000 as not representing a genuine loan to it by Outfitters actually expected to be repaid. Charles therefore reasons that Arthur and Credit were substantially one and the same, since Arthur controlled Credit, and the account payable by Outfitters to Arthur ought to be offset by the account receivable from Credit.
However, the projected theory of a washout of Outfitters' debt to Arthur as against the account receivable from Credit begs the question. It assumes that Arthur individually was the purchaser of the shares; that Credit was acting as his alter ego, and that the funds emanating from Outfitters were in fact a loan to Arthur via Credit. But we have already sustained the finding of the trial court that Outfitters was the real purchaser of the shares of stock in question. The moneys it expended must therefore be regarded as having been paid as the quid pro quo for the stock. This fact is the true reason why, in the light of the court's conclusions on the facts, the $144,000 item cannot be regarded as an asset of the corporation in reconstructing its capital structure, for the purposes of the issue of depletion of capital. In that light, there is no *227 justification at all for striking out the debt owing to Arthur on the books of the corporation in determining the capital depletion. The book obligation to Arthur, who was never served or represented in this proceeding, must for purposes of this litigation be taken as a prima facie, valid and subsisting obligation of the corporation. Charles' contention is thus seen to have no merit.
In reaching the amount of its judgment, the trial court found that as of February 1959 the capital had been impaired to the extent of $70,022.69, but only $46,127.21 of this amount had been expended during the period of impairment on account of the purchase of Charles' shares of stock. Accordingly, the liability of Charles was fixed at $46,127.21. The trial record supports this conclusion.
For the reasons expressed above, as well as the findings and conclusions set forth in the opinion of the trial court, the judgment is affirmed.