778 A.2d 529 (2001)
343 N.J. Super. 254
ASSOCIATES HOME EQUITY SERVICES, INC., f/k/a Ford Consumer Finance Company, a New York Corporation, Plaintiff-Respondent,
v.
Beatrice TROUP and Mr. Troup, husband of Beatrice Troup; Curtis Troup and Mrs. Curtis Troup, his wife, Defendants-Appellants, and
State of New Jersey, United States of America, Defendants.
Beatrice Troup and Curtis Troup, Third-Party Plaintiffs/Appellants,
v.
Gary Wishnia, General Builders Supply Inc.; Property Redevelopment Center, Inc.; East Coast Mortgage Corporation; and Jeffrey Ahrens, Third-Party Defendants/Respondents.
Superior Court of New Jersey, Appellate Division.
Argued May 29, 2001.
Decided July 25, 2001.
*533 Madeline L. Houston, Paterson, argued the cause for appellants (Houston & Totaro, *534 attorneys; Ms. Houston and Melissa J. Totaro, on the brief).
Anthony J. Laura, Newark, argued the cause for respondent Associates Home Equity Services, Inc. f/k/a Ford Consumer Finance Company (Reed, Smith, attorneys; Mr. Laura and Greg A. Dadika, on the brief).
Kathleen Cavanaugh, Parsippany, argued the cause for respondents East Coast Mortgage Corp and Jeffrey Ahrens (Greiner, Gallagher & Cavanaugh, attorneys; Ms. Cavanaugh, on the brief).
Kenneth Zimmerman of the D.C. Bar, admitted pro hac vice, Washington, DC, argued the cause for New Jersey Institute for Social Justice, Inc. and amicus curiae for appellants Beatrice Troup and Curtis Troup (Gibbons, Del Deo, Dolan, Griffinger & Vecchione, attorneys; Lawrence S. Lustberg and Risa E. Kaufman, Newark, on the brief).
Before Judges HAVEY, CUFF and LISA. *530 *531
*532 The opinion of the court was delivered by HAVEY, P.J.A.D.
This is a foreclosure action. Defendants Beatrice and Curtis Troup, African-Americans, obtained a mortgage loan from third-party defendant East Coast Mortgage Corp. (ECM) to pay for repairs on their Newark home made by third-party defendants Gary Wishnia, General Builders Supply, Inc. and Property Redevelopment Center, Inc. (collectively Wishnia). The mortgage and note were assigned by ECM to Associates Home Equity Services, Inc. (Associates). When the Troups defaulted, Associates instituted this foreclosure proceeding. The Troups filed a counterclaim against Associates and a third-party complaint against Wishnia and ECM, claiming violations of the Consumer Fraud Act (CFA), N.J.S.A. 56:8-1 to -106, the Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -49, the Fair Housing Act (FHA), 42 U.S.C.A. §§ 3601 to 3631, the Civil Rights Act (CRA), 42 U.S.C.A. § 1981, and the Truth-In-Lending Act (TILA), 15 U.S.C.A. § 1635. The trial court granted summary judgment dismissing all of the Troups' claims against Associates and ECM, and entered a judgment of foreclosure in favor of Associates. The court found that the terms of ECM's construction loan were not unconscionable and that the Troups' affirmative claims under the applicable state and federal laws were barred by the governing statute of limitations. We granted the Troups' motion for leave to appeal.
We affirm in part and reverse in part. We conclude that it was premature to dismiss the Troups' claim that Associates engaged in predatory lending activities. The Troups are entitled to discovery on this claim. Further, although the Troups' affirmative claims against Associates under the governing statutes are time-barred, they may be considered in support of the affirmative defense of equitable recoupment. See R. 4:5-4 (if a party mistakenly designates an affirmative defense as a counterclaim, the court may in the interest of justice, treat the pleading "as if there had been a proper designation"). We further conclude that genuine issues of material fact exist respecting whether the "Holder Rule," 16 C.F.R. § 433, applies in this case, subjecting ECM to liability for the wrongdoings of Wishnia, the home repair contractor. Fact issues also exist as to whether defendants engaged in unconscionable business practices under the CFA.
Considering the evidentiary material in a light most favorable to the Troups, see Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 666 A.2d 146 (1995), these are the facts. Beatrice Troup, a seventy-four *535 year old African American, has lived at 62 Vanderpool Street in Newark for approximately forty years. Following a telephone solicitation by Gary Wishnia, an agent for General Builders Supply, Inc., Beatrice and her son Curtis executed a contract for exterior home repairs with General on September 1, 1995. The contract price was $38,500, payable "$479.75 for 240 months." Beatrice claims that Wishnia told her "not to worry, he would get me financing." An amended contract was executed on November 16, 1995, for additional interior home repairs, increasing the contract price to $49,990. The agreement provided that "[payments] are to be made beginning January 1, 1996 payable to Property Redevelopment Center, Inc. until permanent financing is obtained."[1]
Some time before September 14, 1995, Jeffrey Ahrens, ECM's representative, prepared the Troups' loan application. A credit search was conducted. According to Beatrice, the Troups had no personal dealings with ECM. She and her son Curtis dealt directly with Wishnia who arranged a limousine to transport the Troups to ECM's office to close the loan. Also, Wishnia did the "leg work" in processing the loan and obtained all income documentation required by ECM.
The Troups' loan application, dated September 14, 1995, but not signed by them until the closing date of April 27, 1996, provided for a $46,500 loan at an annual interest rate of 11.65 percent, adjustable after six months. The Truth-In-Lending disclosure form signed by the Troups at closing stated that the loan was a "balloon" type, payable in fifteen years, with the last payment being $41,603.58. The Troups were also charged four points, or four percent of the total loan amount. At the closing, Beatrice was required to execute a deed conveying the property to herself and her son.
At some point after April 27, 1996, ECM assigned the mortgage and note to Associates. On May 11, 1998, Associates filed a foreclosure complaint alleging that the Troups had failed to make the required payments under the mortgage and note. The Troups filed an answer, counterclaim and third-party complaint consisting of fifteen counts against the Wishnia defendants, ECM and Associates. Pertinent here are the counts charging Wishnia with "unconscionably poor" workmanship, and that Wishnia had conspired with ECM to place the mortgage financing with ECM and "to reap profits by subjecting the Troups to unconscionable, illegal and fraudulent home repair and financing transactions." The Troups charged Associates and third-party defendants with unconscionable and deceptive conduct in violation of the CFA. They further allege that ECM violated the TILA by failing to provide them with a "clear and conspicuous notice" of the expiration date of their right to rescind, failing to make proper disclosures, and materially understating the finance charges. Finally, the Troups asserted that Associates "participated in, authorized and/or ratified and/or had constructive knowledge of" the deceptive unconscionable acts of ECM and engaged in predatory lending practices in violation of the FHA, the CRA, and the LAD.
In dismissing all of the Troups' claims against ECM and Associates, and entering a judgment of foreclosure in Associates' favor, the trial court found that the terms of the mortgage loan given to the Troups were not "unconscionable when looked at in its entirety," given the fact that, although a 6.6 percent rate was available to "prime borrowers," the Troups "did not appear to be AAA rating." The claims *536 against ECM based on Wishnia's deceptive and unconscionable conduct and workmanship were dismissed because, according to the court, ECM could not be held accountable for Wishnia's conduct. The court also determined that all of the Troups' claims against ECM and Associates were barred by the governing statutes of limitations under the LAD, the FHA and the CFA. Finally, the court dismissed the Troups' demand for rescission under the TILA, concluding that "there was conspicuous notice given" of the right to rescind.

I
The Troups and amicus contend that the trial court erred in dismissing the Troups' claim of predatory/discriminatory lending practices against Associates, claiming that genuine fact issues exist precluding summary judgment. Amicus contends that at the very least the dismissal of the claim was premature because the Troups did not have the opportunity to develop it by way of meaningful discovery. We agree with amicus.[2]
The Troups and amicus claim that Associates engaged in a predatory lending practice by actively discriminating against them in consort with ECM by treating the Troups, African-Americans, less favorably than white borrowers in violation of the FHA, the CRA, and the LAD. Amicus adds that Associates may also be held accountable for ECM's discriminatory practice on the theory that Associates "controlled" ECM's conduct.[3] The Troups do not seek money damages against Associates for any violation of these statutes. Rather, they argue that Associates' discriminatory conduct supports the affirmative defense of equitable recoupment in these foreclosure proceedings. The trial court did not address this issue.
Predatory lending has been described as:
a mismatch between the needs and capacity of the borrower.... In essence, the loan does not fit the borrower, either because the borrower's underlying needs for the loan are not being met or the terms of the loan are so disadvantageous to that particular borrower that there is *537 little likelihood that the borrower has the capability to repay the loan.
[Daniel S. Ehrenberg, If the Loan Don't Fit, Don't Take It: Applying the Suitability Doctrine to the Mortgage Industry to Eliminate Predatory Lending, 10 J. Affordable Housing & Community Dev. L. 117, 119-20 (Winter 2001).]
The Troups' expert, Calvin Bradford, summarized the concept of predatory lending as follows:
In using the term "predatory lending" I refer to lenders who target certain populations for onerous credit terms. The population generally targeted includes, among others, the elderly, minorities, and residents of neighborhoods that do not have ready access to mainstream credit. Credit terms not warranted by the objective facts regarding the creditworthiness of these individuals are imposed upon them because for various reasons the lenders feel they can take advantage of a borrower. Typically predatory lenders take advantage of borrowers due to their lack of sophistication in the lending market, due to their lack of perceived options for the loan based on discrimination or some other factor, or due to deceptive practices engaged in by the lender that mislead or fail to inform the borrower of the real terms and conditions of the loan. The record in this case indicates that this is consistent with what occurred in the Troup transaction.
Specifically, the Troups and amicus charge "reverse redlining" in this case. "Redlining is `the practice of denying the extension of credit to specific geographic areas due to the income, race or ethnicity of its residents.'" Hargraves v. Capital City Mortgage Corp., 140 F.Supp.2d 7, 20 (D.D.C.2000) (quoting United Companies Lending Corp. v. Sargeant, 20 F.Supp.2d 192, 203 n. 5 (D.Mass.1998)). The term "redlining" is derived from the actual practice of drawing a red line around designated areas in which credit is to be denied. Sargeant, supra, 20 F.Supp.2d at 203 n. 5. "Reverse redlining is the practice of extending credit on unfair terms to those same communities." Ibid.; see also Hargraves, supra, 140 F.Supp.2d at 20; Honorable v. Easy Life Real Estate Sys., 100 F.Supp.2d 885, 892 (N.D.Ill.2000). Congress has reported that "reverse redlining... [is] the targeting of residents of those same communities for credit on unfair terms. Considerable testimony before the committee indicates that the communities lacking access to traditional lending institutions are being victimized in this fashion by second mortgage lenders, home improvement contractors, and finance companies...." S.Rep. No. 103-169, U.S.Code Cong. & Admin.News 1994, 1881 at 1905. Reverse redlining has been held to violate the FHA and the CRA. Honorable, supra, 100 F.Supp.2d at 892. We do not hesitate to conclude that the practice violates the LAD as well. See N.J.S.A. 10:5-12i(1) (it is unlawful for a mortgage company to "discriminate against any person ... because of race, ... in the granting, ... or in the fixing of the rates, terms, conditions or provisions" of a mortgage loan).
A plaintiff may establish a colorable claim of reverse redlining by demonstrating that "defendants' lending practices and loan terms were `unfair' and `predatory,' and that the defendants either intentionally targeted on the basis of race, or that there is a disparate impact on the basis of race." Hargraves, supra, 140 F.Supp.2d at 20. See also United States v. Mitchell, 580 F.2d 789, 791 (5th Cir.1978) (the FHA prohibits "not only direct discrimination but practices with racially discouraging effects"); and see Jackson v. Okaloosa County, 21 F.3d 1531, 1543 (11th *538 Cir.1994) (FHA violation can be demonstrated by a showing of either direct discrimination or discriminatory effects).
In this case the Troups' predatory lending claim was dismissed without permitting them to conduct meaningful discovery on the issue. The Troups laid the foundation for a reverse redlining case by establishing that they are African Americans living in a predominately African-American neighborhood in Newark. Their expert stated that the 11.65 percent interest rate and other terms of the loan were unjustified from an objective viewpoint, given the Troups' credit history and favorable debt-to-income ratio. Moreover, an Associates' representative testified during deposition that Associates paid a premium of $2,325 to ECM for securing the Troups' loan. He explained that "[w]e [Associates] pay a premium for the loan ... [which] increase[s] as the interest rate of the loan increased," a practice recognized in the lending community as "yield spread premium."
Also significant is the fact that Associates gave ECM a "pre-approval determination" on February 23, 1996, two months before the Troups executed their loan application with ECM and ECM assigned the loan to Associates nine days after the loan was closed. The Troups argue that a fair inference can be drawn from these facts that Associates participated in inflating the interest rate and imposed the terms of the loan characterized by the Troups' expert as "onerous." These facts at the very least are supportive of the Troups' claim that Associates participated in the targeting of inner-city borrowers who lack access to traditional lending institutions, charged them a discriminatory interest rate, and imposed unreasonable terms.
With this showing, we agree with the Troups and amicus that the Troups were entitled to additional discovery in order to bolster their predatory-lending assertion. See Wilson v. Amerada Hess Corp., 168 N.J. 236, 253, 773 A.2d 1121 (2001) (slip op. at 22) (denial of discovery was abuse of discretion because "we cannot dismiss the possibility that the information plaintiffs sought would raise a jury question on the issue of breach of the implied covenant"). They understandably seek additional information from Associates respecting any guidelines it followed in fixing the rate and terms of the Troups' loan, and whether in fact those guidelines are facially, or as applied, discriminatory against borrowers based on their place of residence, income, race or ethnicity.
Further, we agree with the Troups that they are entitled to be informed concerning loans made by ECM and Associates to other New Jersey borrowers during the time period when the loan was made to the Troups. This information may or may not disclose a pattern of discriminatory lending practice in New Jersey's inner cities. If it does, the trial court should consider the Troups' request for further information about the loans, such as the location of the property, and race and income of the borrowers. The discovery order must not, of course, be overly burdensome and should be made subject to any legitimate claim of confidentiality, appropriate protective orders and redaction.
We agree with the trial court that the Troups' affirmative claims for damages against Associates under the FHA, the CRA and the LAD are barred by the governing statutes of limitations. The alleged discriminatory conduct on the part of ECM and Associates occurred from September 1995 through April 27, 1996, when the Troups closed on their loan. The Troups filed their counterclaim and third-party complaint on August 9, 1999. The Troups' claims under the CRA, the *539 FHA and the LAD are governed by a two-year statute of limitations.[4]
However, the Troups' claims under the pertinent federal and state statutes are cognizable under the theory of equitable recoupment as an affirmative defense to Associates' foreclosure complaint. "[T]he fundamental purpose of recoupment... is the examination of a transaction in all its aspects to achieve a just result." Beneficial Fin. Co. of Atlantic City v. Swaggerty, 86 N.J. 602, 612, 432 A.2d 512 (1981). A successful recoupment defense acts to reduce the amount the plaintiff can recover on the claim for the debt when the counterclaim arises from the same transaction. Id. at 611, 432 A.2d 512.
Further, it has been observed that:
any claim of recoupment must arise out of the identical transaction that provided plaintiff with a cause of action, and no affirmative relief may be granted independent of plaintiff's claim. As an equitable concept, judges invented the doctrine of equitable recoupment in order to avoid an unusually harsh or egregious result from a strict application of a statute of limitations.
[Midlantic Nat'l Bank v. Georgian Ltd., 233 N.J.Super. 621, 625-26, 559 A.2d 872 (Law Div.1989) (quoting Superior Air Prods. Int'l v. Dir., Div. of Taxation, 9 N.J. Tax 463, 470-71, aff'd, 10 N.J. Tax 238 (App.Div. 1988) (citations omitted)).]
Consequently, "the defense of recoupment `is never barred by the statute of limitations so long as the main action itself is timely.'" Nester v. O'Donnell, 301 N.J.Super. 198, 208, 693 A.2d 1214 (App. Div.1997) (quoting Beneficial, supra, 86 N.J. at 609, 432 A.2d 512).
Consequently, the Troups may assert their recoupment defense under both New Jersey and federal law notwithstanding expiration of the controlling statutes of limitations. See Beneficial, supra, 86 N.J. at 608, 432 A.2d 512 (borrowers have the right to assert recoupment in a counterclaim against lender under the TILA, despite expiration of the one-year statute of limitations). The recoupment defense in this case arises out of the same transaction as the claim for the debt. Id. at 610, 432 A.2d 512. The underlying loan transaction was the common source of both the Troups' liability to pay the debt and their correlative rights under the fair housing and civil rights statutes. The Troups' recoupment defense is not intended to invalidate the debt; it is asserted to reduce the amount that Associates may recover on its claim.
Associates argue that the underlying premise of recoupment is inapplicable here because its complaint is for foreclosure, rather than for collection of a debt. In support of that proposition, it cites New York Guardian Mortgage Corp. v. Dietzel, 362 Pa.Super. 426, 524 A.2d 951, 953 (1986), which concluded that "a judgment in foreclosure is not a judgment for money damages" under the TILA, observing that:
An action in mortgage foreclosure is strictly an in rem proceeding, and the purpose of a judgment in mortgage foreclosure is solely to effect a judicial sale *540 of the mortgaged property. A judgment in a mortgage foreclosure action is not a judgment for money damages and therefore cannot be "an action to collect amounts owed" or "an action to collect the debt" as required under § 1640(h) and (e) of the Truth-In-Lending Act.
[Ibid. (citation omitted).]
The Bankruptcy Court in Dangler v. Central Mortgage Co., 75 B.R. 931, 935 (Bkrtcy.E.D.Pa.1987), expressly disagreed with New York Guardian, holding that "[o]n its own terms, the [New York Guardian ] decision is plainly incorrect." Id. at 935.
Further, a foreclosure action is not strictly an in rem proceeding. It is a quasi in rem procedure, Resolution Trust Corp. v. Berman Indus., Inc., 271 N.J.Super. 56, 62, 637 A.2d 1297 (Law Div.1993), to determine not only the right to foreclose, but also the amount due on the mortgage. Central Penn. Nat'l Bank v. Stonebridge Limited, 185 N.J.Super. 289, 302, 448 A.2d 498 (Ch.Div.1982). As stated, what the Troups seek is a diminution of the amount due based on Associates' violation of statutory fair housing and civil rights laws. In our view, it would be fundamentally unfair and contrary to the remedial goals expressed by these statutes to preclude the recoupment remedy simply because it is invoked in a foreclosure proceeding. Without the defense, the mortgagee could simply take the mortgaged premises, leaving the borrower without a remedy.[5] We therefore, reverse the summary judgment order dismissing the Troups' claim against Associates, and direct that an appropriate discovery order be entered.

II
The Troups and amicus argue that the trial court erred in dismissing the Troups' claims against ECM and Ahrens based on the so-called "Holder Rule."
16 C.F.R. § 433.2 (2001) provides that, in connection with any sale of goods or services to consumers, affecting commerce, it is an unfair or deceptive act or practice within the meaning of § 5 of the Federal Trade Commission Act for a seller to accept as full or partial payment for the services rendered:
the proceeds of any purchase money loan (as purchase money loan is defined herein), unless any consumer credit contract made in connection with such purchase money loan contains the following provision in at least ten point, bold face, type:

NOTICE
ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.

[Id. at § 433.2(a).]
A "[c]onsumer credit contract" is defined as "[a]ny instrument which evidences or embodies a debt arising from a `Purchase Money Loan' transaction or a `financed sale' ...." 16 C.F.R. at § 431.1(i) (2001). *541 16 C.F.R. § 433.1(e) defines "[f]inancing a sale" as "[e]xtending credit to a consumer in connection with a `Credit Sale' within the meaning of the TILA and Regulation Z." The TILA, specifically 15 U.S.C.A. § 1602(g) defines "credit sale" as:
any sale in which the seller is a creditor. The term includes any contract in the form of bailment or lease if the bailee or lessee contracts to pay as compensation for use a sum substantially equivalent to or in excess of the aggregate value of the property and services involved and it is agreed that the bailee or lessee will become, or for no other nominal consideration has the option to become, the owner of the property upon full compliance with his obligations under the contract.

[Ibid. (emphasis added).]
Further, Regulation Z defines "credit sale" as "any sale in which the seller is a creditor." 12 C.F.R. § 226.2(a)(16).
Essentially, the Holder Rule strips the ultimate holder of the paper of its traditional status as a holder-in-due-course and subjects it to any potential defenses which the purchaser might have against the seller. Federal Trade Comm'n v. Winters Nat'l Bank & Trust Co., 601 F.2d 395, 397 (6th Cir.1979). The Federal Trade Commission has included within the reach of the Holder Rule those sellers and creditors who "employ procedures in the course of arranging the financing of a consumer sale which separate the buyer's duty to pay for goods or services rendered from the seller's reciprocal duty to perform as promised." 40 F.Reg. 53,506, 53,522 (1975). The agency has recognized this practice as "dragging the body,"[6] wherein:
a merchant, desiring to circumvent restrictions upon the holder in due course doctrine, arranges for a consumer purchase to be financed by a cooperating financing agency. The resultant financial transaction has the appearance of a direct cash loan, payment of which can be enforced by the loan company without reference to the underlying transaction.

[40 F.Reg., supra, at 53,514.]
Consequently, the Holder Rule expressly incorporates "purchase money loan[s]" within the scope of the rule. See 16 C.F.R. § 433.2(b). A "[p]urchase money loan" is defined as "[a] cash advance which is received by a consumer" which is applied "in whole or substantial part, to a purchase of goods or services from a seller who (1) refers consumers to the creditor or (2) is affiliated with the creditor by common control, contract or business arrangement." 16 C.F.R. § 431.1(d).
Here, there is at the very least a fact issue concerning whether ECM's note constituted a "purchase money loan." ECM's financing provided the Troups with a "cash advance" totaling $49,990 which was applied in "substantial part" to pay for the improvements made to the home by Wishnia. Ibid. There is also evidence that Wishnia "refers consumers" to ECM. Ibid. Indeed, in this case Wishnia made all the arrangements for the loan and had the Troups chauffeured to ECM's offices to close. A reasonable jury could also conclude that Wishnia was "affiliated with" ECM by "business arrangement." Ibid.[7] The Troups presented evidence that Wishnia *542 and ECM had mutually arranged at least six other home improvement or equity loans to other customers living in the City of Newark or the Newark area.
Nevertheless, ECM argues that the Holder Rule is inapplicable for three reasons. First, it claims that it did not "purchase" a "consumer credit contract" because initially the Troups paid Wishnia's affiliated companies monthly payments on the home repair contracts before the loan was made by ECM. This argument ignores the undisputed evidence that, before the Troups signed the first contract, Wishnia told Beatrice "not to worry, he would get [her] financing." Further, the second contract provides that "[payments] are to be made beginning January 1, 1996 payable to Property Redevelopment Center, Inc. until permanent financing is obtained." (Emphasis added). Indeed, after the contract was executed, Wishnia promptly arranged the loan with ECM, with whom he had placed other home repair contracts on behalf of other borrowers. In our view, reasonable minds could conclude that Wishnia and ECM contemplated from the outset that the loan to finance Wishnia's contracting work would be placed by ECM. We agree with the Troups that, under these circumstances, Wishnia and ECM should not be permitted to circumvent the consequences of the Holder Rule simply because Wishnia arranged for temporary financing with his affiliated companies.
Second, ECM argues that the Holder Rule is inapplicable because the bold-typed notice required by 16 C.F.R. 433.2 was never placed on the relevant documents. We reject that argument. Although it is true that the documents did not contain the requisite notice, it is inconceivable to us that ECM and Ahrens may evade the remedial reach of the Holder Rule simply because of that omission. It was their responsibility to insert the notice. Indeed, as a financing institution, ECM must be charged with notice of the requirement. Moreover, the bold-typed notice is required by New Jersey law. N.J.A.C. 13:45A-16.2(a)(13)ii, states:
No home improvement contract shall require or entail the execution of any note, unless such note shall have conspicuously printed thereon the disclosures required by ... Federal law (16 C.F.R. section 433.2) concerning the preservation of buyers' claims and defenses.
"[T]he law is a silent factor in every contract." Silverstein v. Keane, 19 N.J. 1, 13, 115 A.2d 1 (1955) (citation and quotation marks omitted). Moreover, equity looks to substance rather than form. Kleinberg v. Schwartz, 87 N.J.Super. 216, 222, 208 A.2d 803 (App.Div.), aff'd, 46 N.J. 2, 214 A.2d 313 (1965). These well-settled maxims should apply here to effectuate New Jersey's regulatory goal by "reading into" the pertinent documents the notice required by 16 C.F.R. § 433.2 and N.J.A.C. 13:45A-16.2(a)(13)ii.
Third, ECM claims that the Holder Rule is inapplicable because it has assigned the note to Associates.[8] We reject that argument as well. The clear and unambiguous language of the Rule "notifies all potential holders that, if they accept an assignment of the contract, they will be `stepping into the seller's shoes.'" Lozada v. Dale Baker Oldsmobile, Inc., 91 F.Supp.2d 1087, 1094 (W.D.Mich.2000) (quoting Oxford Fin. Cos., Inc. v. Velez, 807 S.W.2d 460, 463 (Tex.Ct.App.1991) (emphasis added)). Thus, the creditor-assignee becomes "`subject to' any claims or defenses the debtor can assert against the *543 seller." Oxford Fin., supra, 807 S.W.2d at 463; and see Simpson v. Anthony Auto Sales, Inc., 32 F.Supp.2d 405, 409 n. 10 (W.D.La.1998) (holding that the Holder Rule permits consumers to bring claims against assignee without regard to whether damages warranted rescission). Here, ECM, as "a potential holder" had notice that if it procured the purchase money loan arranged by Wishnia, it may be stepping into Wishnia's shoes. We cannot accept the proposition that the FTC contemplated that such result would not attach simply because of a subsequent assignment of the loan, especially when, as here, it is claimed that ECM actively participated with Wishnia, the seller, in placing the loan with the Troups.[9]
We conclude that fact issues exist respecting ECM's liability under the Holder Rule. Summary judgment dismissing the Troups' claims is therefore reversed. Ahrens' argument that there is no basis to hold him personally liable may be revisited after conclusion of all discovery concerning application of the Holder Rule.

III
The Troups argue that the trial court erred in dismissing their consumer fraud claims against Associates and third-party defendants.
N.J.S.A. 56:8-2 prohibits:
[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon [it] ... in connection with the sale or advertisement of ... merchandise ....

[Ibid. (emphasis added).]
Loans are included in the definition of "advertisement," N.J.S.A. 56:8-1(a), and the definition of "merchandise," see N.J.S.A. 56:8-1(c), has been held to include "the offering, sale, or provision of consumer credit." Lemelledo v. Beneficial Management Corp., 150 N.J. 255, 265, 696 A.2d 546 (1997).
The word "unconscionable" must be interpreted liberally so as to effectuate the public purpose of the CFA. Kugler v. Romain, 58 N.J. 522, 543, 279 A.2d 640 (1971). It is not intended to "erase the doctrine of freedom of contract, but to make realistic the assumption of the law that the agreement has resulted from real bargaining between parties who had freedom of choice and understanding and ability to negotiate in a meaningful fashion." Id. at 544, 279 A.2d 640. The standard of conduct contemplated by the unconscionability clause is "good faith, honesty in fact and observance of fair dealing[,]" and the need for application of that standard "is most acute when the professional seller is seeking the trade of those most subject to exploitation-the uneducated, the inexperienced and the people of low incomes." Ibid. Whether a particular practice is unconscionable must be determined on a case-by-case basis. Id. at 543, 279 A.2d 640. In this case, whether the acts of Associates and third-party defendants *544 were unconscionable was for the jury to decide.
As noted, the trial court concluded that the rate charged and terms of the loan were not unconscionable. The trial court's assessment of the terms of the loan ignored the opinion of the Troups' expert, Calvin Bradford. Bradford, stated that "[t]he average initial rate on a one year adjustable rate mortgage in April 1996 was 5.73[%]" (the Troups received a rate of 11.65%). Moreover, Bradford stated that the "[a]verage points in April 1996 on one year adjustable mortgages was 1.4" (the Troups were charged four points). Bradford observed that ECM's credit report listed no negatives on Beatrice's credit history, while Curtis Troup's credit history revealed only a $75 "charge off" and a DMV liability of $250. The expert also claimed that the Troups' debt-to-income ratio was favorable. In sum, Bradford opined that "the income, credit history and other factors ... [did] not warrant the credit terms given to the Troups."
Conversely, third-party defendants assert that the Troups received higher loan terms because of their "derogatory" credit history. However, the "derogatory history" offered mainly concerns the Troups' sketchy credit after the loan was obtained. Further, the trial court's finding that ECM's conduct regarding the procurement of the loan, specifically, that the Troups did not lack bargaining power, is at best conclusory. The trial court stated:
This Court is not satisfied that the terms were unfavorable nor that there was any disproportionate bargaining power between the Troups and the lending institution. While it does appear that the Troups did not bargain with the lending institution, that does not in and of itself mean they had no bargaining power.
It is well established, however, that "`[t]he effect of the unconscionability rule is not designed to upset the terms of a contract resulting from superior bargaining strength, but to prevent oppression and unfair surprise.'" Jefferson Loan Co., Inc. v. Livesay, 175 N.J.Super. 470, 480, 419 A.2d 1164 (Dist.Ct.1980) (quoting New Jersey Study Comment to N.J.S.A. 12A:2-302, par. 1). The Troups stated in their answers to interrogatories that they spoke to no one from ECM until they were brought to ECM's offices to sign the loan papers on April 27, 1996. Beatrice was confused because of the number and complexity of the documents. When she asked ECM's attorney if the principal balance will be due in fifteen years, the attorney told her not to worry about it. We are satisfied that, considering all of the evidentiary material in a light most favorable to the Troups, a reasonable jury could conclude that Associates and third-party defendants engaged in an unconscionable business practice. Therefore, we reverse the summary judgment order dismissing the consumer fraud claim.

IV
We affirm the trial court's dismissal of the Troups' demand for rescission under the TILA. 15 U.S.C.A. § 1635(a) relevantly states:
in the case of any consumer credit transaction... the obligor shall have the right to rescind the transaction until midnight of the third business day following the consummation of the transaction or the delivery of the information and rescission forms.... The creditor shall clearly and conspicuously disclose... to any obligor in a transaction subject to this section the rights of the obligor under this section.
Further, 15 U.S.C.A. § 1635(f) provides:
An obligor's right of rescission shall expire three years after the date of consummation *545 of the transaction or upon the sale of the property ... notwithstanding the fact that the information and forms required under this section or any other disclosures required under this part have not been delivered to the obligor....
12 C.F.R. § 226.23 (2001) provides that the notice of right to rescind shall clearly and conspicuously disclose: (1) the consumer's right to rescind the transaction; (2) how to exercise the right to rescind with a form for that purpose, which must include the address of the creditor's place of business; (3) the effect of rescission; and (4) the date the rescission period expires.
The purpose of the three-day waiting period under § 1635(a) is to give the consumer the opportunity to reconsider any transaction which would have the serious consequence of encumbering title to his or her home. If a lender's notice of the right to rescind is deficient, a mortgagor's rescission rights are extended to three years. 15 U.S.C.A. § 1635(f). If the creditor fails to comply with the written requirements of the notice to rescind, or if a "material" disclosure is not correctly made, the rescission period is extended for three years. Ibid., 12 C.F.R. § 226.23(a)(3).
We agree with the trial court's determination that the notice of right to cancel in this case complied with the mandates of the TILA. The "date of the loan" is "4/27/1996." The form signed by the Troups is clearly identified as the "Notice of Right to Cancel" and contains ECM's address. Further, the notice provides a subtitle "How to Cancel," which informed the Troups as to the manner, date and method of cancellation. The Troups argue that the notice is confusing because under the subtitle "I Wish to Cancel" is the date "4/27/1996." They argue that the insertion of the date had the effect of causing them to believe that their right to cancel expired on that date. We disagree. On the same page as this notation, the Notice of Right to Cancel expressly states: "[y]ou have a legal right under federal law to cancel this transaction, without cost, within three business days from ... the date of the loan shown above...." The "date of the loan" is "4/27/1996." We are satisfied that the notice of right to cancel is clear and unambiguous. See Smith v. Highland, 915 F.Supp. 281, 285 (N.D.Ala.1996), aff'd, 108 F.3d 1325 (11th Cir.1997). Indeed, the notice is substantially similar, if not identical, to the form suggested in the Federal Regulations. 13 C.F.R., Pt. 226, App. H.
The Troups further argue that the three-year time for rescission is applicable because ECM failed to disclose as a "finance charge," a $50 disbursement fee imposed by ECM's attorney. Notably, the Troups' counterclaim alleges that ECM failed to properly disclose a $25 recording fee and a $360 fee for the payoff of a judgment lien. It makes no mention of the $50 fee imposed by ECM's attorney.
15 U.S.C.A. § 1635(i)(2) provides that "any finance charge shall be treated as being accurate for the purposes of this section if the amount disclosed as the finance charge does not vary from the actual finance charge by more than $35...." The Troups argue that the fee charged by ECM's attorney, being in excess of $35, constitutes an undisclosed "finance charge." However, 15 U.S.C.A. § 1605(a) expressly states that the "finance charge shall not include fees and amounts imposed by third party closing agents (including settlement agents, attorneys ...) if the creditor does not require the imposition of the charges or the services provided and does not retain the charges." (Emphasis added). The $50 fee complained of was payable to a third party closing agent.
*546 It was not a disbursement fee required by ECM or retained by it.
Affirmed in part, reversed and remanded in part.
NOTES
[1] Property Redevelopment Center was a separate enterprise operated by Wishnia.
[2] Amicus presented a certification to us by Elvin Wyly an Assistant Professor in the Department of Geography and the Center for Urban Research at Rutgers University. Because the certification was not presented below, we advised the parties that we would consider the certification only for the purpose of giving an overview concerning predatory lending practices in New Jersey. Professor Wyly states that it is evident from the data submitted pursuant to the Home Mortgage Disclosure Act of 1975 (HMDA), 12 U.S.C.A. §§ 2801 to 2810, that a "dual housing finance market exists in New Jersey for the refinance and home repair loans" market. Wyly reports that "urban areas of heavy minority concentration are being disproportionately serviced by subprime lenders...." The HMDA's data reveals that in predominately minority neighborhoods, subprime lenders control nearly two-thirds of the home improvement market. He concludes: "[i]n the home improvement market, African-Americans are almost four times as likely to be slotted into subprime/lenders as whites, even after accounting for income, loan amount, and differences between deposit-taking banks and nondepository independent mortgage companies."
[3] We do not pass upon the legal viability of amicus' alternative claim. The cases cited by it stand for the proposition that the duty of a landlord or property owner under the FHA not to discriminate may not be delegated to an agent or employee. See Alexander v. Riga, 208 F.3d 419, 432-33 (3rd Cir.2000), cert. denied, 531 U.S. 1069, 121 S.Ct. 757, 148 L.Ed.2d 660 (2001); Walker v. Crigler, 976 F.2d 900, 904-05 (4th Cir.1992); Marr v. Rife, 503 F.2d 735, 741 (6th Cir.1974). The question as to the applicability of this theory must be addressed by the trial court upon completion of discovery.
[4] There is a two-year statute of limitations governing both the FHA and federal civil rights claim. See 42 U.S.C.A. § 3613(a)(1)(A); Goodman v. Lukens Steel Co., 482 U.S. 656, 660-62, 107 S.Ct. 2617, 2620-21, 96 L.Ed.2d 572, 581-82 (1987) (finding that the two-year personal injury statute of limitations should apply in a civil rights case under 42 U.S.C.A. § 1981), cert. denied, 531 U.S. 1027, 121 S.Ct. 600, 148 L.Ed.2d 513 (2000). A two-year statute of limitations also governs LAD claims. Montells v. Haynes, 133 N.J. 282, 292, 627 A.2d 654 (1993).
[5] Rule 4:64-5 provides that only "germane" counterclaims may be asserted in foreclosure proceedings. We deem the Troups' recoupment defense as "germane." See Sun NLF Ltd. v. Sasso, 313 N.J.Super. 546, 551, 713 A.2d 538 (App.Div.), certif. denied, 156 N.J. 424, 719 A.2d 1023 (1998); Leisure Tech-Northeast, Inc. v. Klingbeil Holding Co., 137 N.J.Super. 353, 356, 349 A.2d 96 (App.Div. 1975).
[6] See In re Brown, 134 B.R. 134, 135 (Bankr. E.D.Pa.1991).
[7] A "[b]usiness arrangement" is defined as "[a]ny understanding, procedure, course of dealing, or arrangement, formal or informal, between a creditor and a seller, in connection with the sale of goods or services to consumers or the financing thereof." 16 C.F.R. § 433.1(g).
[8] The Troups do not argue that the Holder Rule applies to Associates.
[9] There is some debate respecting the level of recovery under the Holder Rule when the consumer asserts an affirmative claim against the creditor. See Crews v. Altavista Motors, Inc., 65 F.Supp.2d 388, 389-90 (W.D.Va. 1999); Lozada, supra, 91 F.Supp.2d at 1093-95. In this appeal, we are called upon only to decide whether the Holder Rule applies, not to define the extent of the Troups' remedy, if it applies. Suffice it to say that, as we understand the Troups' claim, they seek to assert their rights under the Holder Rule by compelling ECM to pay their debt owed to Associates, in the event the Troups do not prevail against Associates. In addition, the Troups seek an award of counsel fees under the CFA.