971 A.2d 1054

MARGARET L. LEE, PLAINTIFF–RESPONDENT, v. FIRST UNION
NATIONAL BANK, A BANKING CORPORATION, WACHOVIA
BANK, N.A., A BANKING CORPORATION, INDIVIDUALLY
AND AS SUCCESSOR IN INTEREST TO FIRST UNION NA-
TIONAL BANK, FIRST UNION BROKERAGE SERVICES, INC.,
AND GREGORY MACK, DEFENDANTS–APPELLANTS.

Argued February 18, 2009—Decided June 3, 2009.

*Beverly Jo Slaughter*, a member of the Virginia bar, argued the cause for appellants (*Stark & Stark*, attorneys; *Thomas B. Lewis* and *Amy Beth Dambeck*, on the brief).

*Henry Gurshman*, argued the cause for respondent.

Justice LaVECCHIA delivered the opinion of the Court.

In this appeal we must determine whether a securities broker's fraudulent activity, in connection with his handling of client funds intended for the purchase of a security, subjects him and the bank and brokerage firm that employed him to liability under the Consumer Fraud Act (CFA or Act), *N.J.S.A.* 56:8–1 to –106. Our analysis of that issue necessitates consideration of three distinct

arguments advanced by the parties: whether the sale of securities is included in the CFA's definition of "merchandise"; whether there is a distinction between the purchase of a security and the purchase of the "service" to buy the security; and whether a securities broker is exempt from CFA liability based on the case law recognizing an exception for learned professionals. We hold that the sale of securities is not covered under the CFA and that recognition of a separate "service" to purchase securities would thwart the CFA's design to keep the sale of securities beyond the CFA's application. In view of our holding, there is no need to address whether securities brokers are the type of professionals to which the learned professional exception would apply.

I.

This appeal arises from an order granting summary judgment to defendants and, therefore, we view the evidence in the light most favorable to the non-moving party, plaintiff Margaret Lee. *See Brill v. Guardian Life Ins. Co. of Am.*, 142 *N.J.* 520, 523, 666 *A.*2d 146 (1995).

The key events in this dispute occurred on May 22, 2000, after Lee received $12,000 in settlement of a personal injury action. Shortly after receiving her settlement check, she went to the Elizabeth branch of defendant, First Union National Bank (First Union), where she maintained a checking account. On that day, she deposited $5,000 from the settlement into her checking account and took the remaining $7,000 in cash. While at the Elizabeth branch bank, Lee asked about making an investment and was referred to defendant, Gregory Mack, who worked as an investment counselor at the bank's facility in Hillside. As it turns out, Mack held dual employment within the First Union family of entities. He was a First Union employee, as well as an employee of First Union Brokerage Services, Inc., where he served as a registered representative.

Lee met with Mack that same day. He recommended that she purchase a mutual fund known as Evergreen Omega. Based on

Mack's recommendation, Lee decided to invest $2,000 by purchasing 61.52 shares of Evergreen Omega. She opened a brokerage account with First Union Brokerage Services and signed a mutual fund disclosure statement, which indicated that she understood the prospectus for the Evergreen Omega Fund. She gave Mack $2,000 in cash to effectuate the purchase.

Unbeknownst to Lee, Mack did not deposit in the brokerage account the $2,000 in cash that she had given to him. On May 25, 2000, when brokerage records indicated that the mutual fund purchase was confirmed, the bank's records revealed not only that the $2,000 had not been deposited in the brokerage account to cover the purchase, but also that Lee had made withdrawals from her checking account during the intervening period, bringing her checking balance down to $591. As a result, Lee's brokerage account had insufficient funds from which to draw in order to pay for the Evergreen Omega unit shares and complete the transaction. The bank applied $500 from Lee's checking account as partial payment for the purchase. It then liquidated $1,500 of the mutual fund units, which had been allocated to Lee's brokerage account, in order to cover the remainder of the balance due to Evergreen Omega Fund for the purchase. That reduced Lee's total trade amount from a $2,000 interest to a $500 interest in the Evergreen Omega Fund.

According to Lee, she spoke with Mack after she became aware of those events and he admitted that he had not deposited the $2,000 cash that she had given him to pay for the mutual fund purchase. She claims that he admitted to converting the money for personal use and offered to give her $1,500 if she would agree not to tell his supervisor about his transgression. Lee would not accept less than the entire $2,000 in return and, when Mack refused, Lee initiated the instant action.

On May 12, 2006, she filed a two-count complaint against First Union; Wachovia Bank, N.A. (as successor by merger to First Union); First Union Brokerage Services, Inc., and Mack. In Count One, Lee claimed that Mack induced her to give him $2,000

in cash for the purchase of securities and that defendants jointly and severally misapplied those funds. In Count Two, she alleged that she suffered economic loss as a result of the misapplication of funds, which constituted an unconscionable commercial practice in violation of the CFA. In lieu of filing an answer, defendants moved for summary judgment. The trial court concluded that the first count was barred by the two-year statute of limitations contained in the New Jersey Uniform Securities Law, *N.J.S.A.* 49:3–47 to –76, and that the second count failed to state a claim because the CFA is inapplicable to the sale of securities. Accordingly, the court dismissed the complaint in its entirety.

On appeal, the Appellate Division reversed the trial court's dismissal of both counts. *Lee v. First Union Nat'l Bank,* 402 *N.J.Super.* 346, 349, 954 *A.2d* 499 (App.Div.2008). Concerning the first count, the panel concluded that the trial court inappropriately had applied the two-year statute of limitations found in the Uniform Securities Law, *N.J.S.A.* 49:3–71(g), when Lee's complaint was subject to the six-year statute of limitations in *N.J.S.A.* 2A:14–1 because it concerned the unlawful "taking, detaining, or converting of personal property." *Lee, supra,* 402 *N.J.Super.* at 352, 954 *A.2d* 499 (internal quotations omitted). Therefore, the panel reinstated Lee's first count.[1] *Ibid.*

Turning to the CFA count, the panel agreed that securities are not considered to be "merchandise" subject to the strictures of the CFA. *Id.* at 351, 954 *A.2d* 499. However, the panel explained that it actually was Mack's "misappropriation" of the money, and not the purchase of the mutual fund itself, which constituted the unlawful practice that Lee claimed violated the CFA. *Ibid.* The panel found the distinction critical because "services" are included among the items listed in the CFA's definition of "merchandise." *Id.* at 350, 954 *A.2d* 499 (citing *N.J.S.A.* 56:8–1(c)). Furthermore, the Appellate Division held that Mack's services were not exempt

---

[1] Because of our limited grant of certification, this issue is not before us. *See infra.*

from CFA liability under the judicially crafted "learned professionals" exception. *Id.* at 350–52, 954 *A.*2d 499 (finding that services were not subject to extensive regulation, citing *Macedo v. Dello Russo,* 178 *N.J.* 340, 345, 840 *A.*2d 238 (2004)).

We granted certification to consider only "whether the purchase of securities comes within the scope of the [CFA]." *Lee v. First Union Nat'l Bank,* 197 *N.J.* 16, 960 *A.*2d 746 (2008).

## II.

In 1960, the Legislature passed the CFA, creating a powerful weapon to curb consumer fraud in this State. Its purpose is to "eliminat[e] sharp practices and dealings in the marketing of merchandise and real estate." *Channel Cos. v. Britton,* 167 *N.J.Super.* 417, 418, 400 *A.*2d 1221 (App.Div.1979); *see also Real v. Radir Wheels, Inc.,* 198 *N.J.* 511, 514, 969 *A.*2d 1069 (2009) (recognizing that CFA "represents a legislative broadside against unsavory commercial practices"). *N.J.S.A.* 56:8–2 prohibits, as an unlawful practice, the "act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, [or] misrepresentation ... in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid." The Act provides a remedy for any consumer who has suffered an "ascertainable loss of moneys or property, real or personal, as a result of [a CFA violation]," including treble damages, costs, and attorneys fees. *N.J.S.A.* 56:8–19. To fully advance its remedial purposes, we construe the Act "liberally in favor of consumers." *Cox v. Sears Roebuck & Co.,* 138 *N.J.* 2, 15, 647 *A.*2d 454 (1994); *see also Czar, Inc. v. Heath,* 198 *N.J.* 195, 201, 966 *A.*2d 1008 (2009) (reiterating that CFA is broad remedial legislation intended to afford strong protection to consumers).

*N.J.S.A.* 56:8–1 defines the material terms used in the CFA:

(a) The term "advertisement" shall include the attempt directly or indirectly by publication, dissemination, solicitation, indorsement or circulation or in any other way to induce directly or indirectly any person to enter or not enter into any

obligation or acquire any title or interest in any merchandise or to increase the consumption thereof or to make any loan;

. . . .

(c) The term "merchandise" shall include any objects, wares, goods, commodities, services or anything offered, directly or indirectly to the public for sale;

. . . .

(e) The term "sale" shall include any sale, rental or distribution, offer for sale, rental or distribution or attempt directly or indirectly to sell, rent or distribute.

■ Although we apply the CFA's operative terms broadly to protect consumers from a wide variety of abhorrent deceptive practices, *see Lemelledo v. Beneficial Mgmt. Corp.*, 150 *N.J.* 255, 264, 696 *A.*2d 546 (1997) ("The language of the CFA evinces a clear legislative intent that its provisions be applied broadly in order to accomplish its remedial purpose, namely, to root out consumer fraud."), we nevertheless must abide by the definitions that control the boundaries of the Act's reach.

■ The goal when interpreting a statute is to determine and effectuate the Legislature's intent. *D'Annunzio v. Prudential Ins. Co. of Am.*, 192 *N.J.* 110, 119, 927 *A.*2d 113 (2007). We first look to the "language of the statute, seeking further guidance only to the extent that the Legislature's intent cannot be derived from the words that it has chosen." *Pizzullo v. N.J. Mfrs. Ins. Co.*, 196 *N.J.* 251, 264, 952 *A.*2d 1077 (2008). In that respect, technical terms, or terms of art, "having a special or accepted meaning in the law, shall be construed in accordance with [that] . . . meaning." *In re Lead Paint Litig.*, 191 *N.J.* 405, 430, 924 *A.*2d 484 (2007) (quoting *N.J.S.A.* 1:1–1); *accord D'Annunzio, supra,* 192 *N.J.* at 119–20, 927 *A.*2d 113. Otherwise, a court shall give the language, selected by the Legislature, its plain meaning. *D'Annunzio, supra,* 192 *N.J.* at 120, 927 *A.*2d 113 (quoting *O'Connell v. State,* 171 *N.J.* 484, 488, 795 *A.*2d 857 (2002)). At the same time, however, we strive to "avoid a literal interpretation of individual statutory terms or provisions that would be inconsistent with the overall purpose of the statute." *State Farm Mut. Auto. Ins. Co. v. Licensed Beverage Ins. Exch.*, 146 *N.J.* 1, 5, 679 *A.*2d 620 (1996). If the language of a statute is ambiguous or susceptible to more

than one possible interpretation, courts will look to other sources to determine the Legislature's intent. *See, e.g., Roberts v. Div. of State Police,* 191 *N.J.* 516, 521–22, 924 *A.2d* 550 (2007) (considering Governor's conditional veto message); *Panzino v. Cont'l Can Co.,* 71 *N.J.* 298, 301–03, 364 *A.2d* 1043 (1976) (examining sponsor statements of bills that were enacted).

## III.

### A.

 Our present interpretive task previously captured the attention of several courts. Clearly, the definition of merchandise does not mention securities among the items intended to be covered. That omission, although plain on the face of the Act, nevertheless carries some measure of ambiguity due to the well-known view of the CFA as being intended to have a broad reach. Therefore, courts before us have looked further to determine whether any indicia of legislative intent about the sale of securities could be gleaned from the legislative history of the Act. In this instance, the mine proved rich.

One case early in the existence of the CFA plumbed the legislative history on the definition of merchandise and uncovered information relevant to our inquiry. In point of fact, in *Neveroski v. Blair,* the Appellate Division traced the legislative history of the CFA to determine whether *real estate* brokerage services fell within the scope of the CFA. 141 *N.J.Super.* 365, 377, 358 *A.2d* 473 (App.Div.1976) (emphasis added), *superseded by statute, N.J.S.A.* 56:8–2. In its analysis, the Appellate Division noted that the original definition of merchandise included "any objects, wares, goods, commodities or services." *Id.* at 377, 358 *A.2d* 473. An amendment, proposed in 1967, would have augmented the definition of merchandise to include "any objects, wares, goods, commodities, *real estate, securities,* services *or anything offered directly or indirectly to the public for sale." Ibid.* (quoting Assemb. Bill No. 715, 191st Leg. Sess.) (emphasis added). How-

ever, as the *Neveroski* court noted, the final amendment that was enacted did not include the terms "real estate" or "securities." *See ibid.* As the *Neveroski* case was winding its way through the courts, the Legislature amended *N.J.S.A.* 56:8-2 to prohibit fraudulent or deceptive practices "in connection with the sale or advertisement of any *merchandise or real estate.*" *Neveroski, supra,* 141 *N.J.Super.* at 377 n. 3, 358 *A.2d* 473 (emphasis added). The Governor's press release issued in conjunction with the signing of that amendatory bill stated that it "would correct the present omission of 'real estate' from coverage under current statutes which provide effective procedures and penalties against misleading, deceptive or fraudulent advertising." *Arroyo v. Arnold–Baker & Assocs., Inc.,* 206 *N.J.Super.* 294, 296, 502 *A.2d* 106 (Law Div.1985) (quoting *Neveroski, supra,* 141 *N.J.Super.* at 377 n. 3, 358 *A.2d* 473).[2] Thus, although the Legislature amended the CFA in 1976 to insert "real estate" within the text of *N.J.S.A.* 56:8-2, securities were not included in either the definition of merchandise in *N.J.S.A.* 56:8-1, or in the text of *N.J.S.A.* 56:8-2.

Based on that history, the Appellate Division in *Neveroski, supra,* held that the deletion of the words "securities" and "real estate" was "a meaningful act on the part of the Legislature eliminating these two areas of commercial activity from the purview of the statute." 141 *N.J.Super.* at 378, 358 *A.2d* 473. The analysis employed by the *Neveroski* panel is unassailable. That

---

[2] As was noted in *Arroyo, supra,* on signing into law the 1976 amendment to the CFA, *see L.* 1975, *c.* 294 (eff. Jan. 19, 1976), then-Governor Brendan Byrne issued a press release stating that it, along with a bill protecting the public against false representation of an organization as being charitable, philanthropic, or non-profit, was "designed to strengthen and clarify" the CFA, and "make[ ] it clear that real estate is covered by the law which prohibits and provides penalties for misleading, deceptive or fraudulent advertising." *Id.* at 297, 502 *A.2d* 106 (quoting Press Release, The Office of the Governor (January 19, 1976)). The press release also noted that then-Assemblyman Byron M. Baer, the sponsor of the bill (which added the words "real estate"), "said his bill will increase the protection of home owners and tenants by *extending to real estate* the broad and strong provisions" of the CFA. *Ibid.* (quoting Press Release, *supra*) (emphasis added).

"real estate" was reinserted into the CFA, while "securities" was not, indicates a legislative intent that securities were not meant to be covered by the CFA. Although the text of the CFA does not state that securities are excluded from coverage, the omission of "securities" from the definition of merchandise effectuates that result. We therefore hold that securities are not meant to be included in the definition of merchandise.[3] We note approvingly that numerous other courts have reached the same conclusion, holding that securities intentionally were not included in the definition of "merchandise" under the CFA. *See, e.g., Stella v. Dean Witter Reynolds, Inc.,* 241 *N.J.Super.* 55, 75, 574 *A.2d* 468 (App.Div.), *certif. denied,* 122 *N.J.* 418, 585 *A.2d* 412 (1990); *see*

---

[3] An update to the examination of legislative action on this subject only solidifies our view of the correctness of the reasoning in *Neveroski.* It appears that, in every legislative session since 1997, a bill has been introduced to add the term "securities" to the definition of "merchandise" in the CFA, but none has been enacted. *See* Assemb. Bill No. 2872, 207th Leg. Sess. (May 1, 1997); Assemb. Bill No. 1321, 208th Leg. Sess. (Jan. 13, 1998); Assemb. Bill No. 1489, 209th Leg. Sess. (Jan. 11, 2000); Assemb. Bill No. 147, 210th Leg. Sess. (Jan. 8, 2002); Assemb. Bill No. 1867, 211th Leg. Sess. (Jan. 22, 2004); Assemb. Bill No. 2957, 212th Leg. Sess. (May 11, 2006); Assemb. Bill No. 3430, 212th Leg. Sess. (July 4, 2006); Assemb. Bill No. 2272, 213th Leg. Sess. (Feb. 26, 2008). At least one bill is currently pending and assigned to the General Assembly's Consumer Affairs Committee, *see* Assemb. Bill No. 2272, 213th Leg. Sess. (Feb. 26, 2008). The text of that bill is worded similarly to those that preceded it:

> (c) The term "merchandise" shall include any objects, wares, goods, commodities, *securities*, services or anything offered, directly or indirectly to the public for sale.

The Sponsor's Statement to that bill is worded similarly to the failed bills that preceded it:

> The consumer fraud act protects consumers from deceptive sales or advertising practices in the marketing of merchandise. "Merchandise" is defined in the law to include objects, wares, goods, commodities, services or anything offered, either directly or indirectly, to the public for sale. Currently, securities are not specifically included in the law's definition of "merchandise."

We note further that a bill of more recent vintage has been introduced to add the term "hedge fund" to the definition of merchandise covered by the terms of the CFA. *See* Assemb. Bill No. 1971, 213th Leg. Sess. (Jan. 28, 2008).

also In re Catanella & E.F. Hutton & Co., Inc. Sec. Litig., 583 F.Supp. 1388, 1442–44 (E.D.Pa.1984); 49 Prospect Street Tenants Ass'n v. Sheva Gardens, Inc., 227 N.J.Super. 449, 468, 547 A.2d 1134 (App.Div.1988); Bramblewood Investors, Ltd. v. C & G Assocs., 262 N.J.Super. 96, 109 n. 6, 619 A.2d 1332 (Law Div.1992).

## B.

██ Similarly, we conclude that the present matter should not be contorted to achieve coverage under the CFA by calling Mack's conduct a fraudulent "service" in order to draw it within the CFA's reach. Doing so thwarts the legislative design that the Act not intrude in the area of securities sales. Our task is to effectuate legislative intent and we discern a clear legislative plan to leave the securities marketplace beyond the penumbra of the CFA's proscriptions.

Indeed, in Stella, supra, a case resembling the instant matter, the Appellate Division held that the CFA did not apply where the defendant misappropriated the plaintiff's money by purporting to sell him shares in an investment, which in fact did not exist, because the misrepresentation related to the sale of securities, which are not merchandise under the Act. 241 N.J.Super. at 74–76, 574 A.2d 468 ("[A] fraud in the sale of shares of stock or other securities is not within the compass of [the CFA]."). Although our prior decisions have determined that the CFA does protect consumers against certain deceptive practices in the regulated world of the financial industry, particularly in connection with loans and consumer credit, see Lemelledo, supra, 150 N.J. at 259–60, 266, 696 A.2d 546 (holding that CFA applies to loan-packing, which is "a practice on the part of commercial lenders that involves increasing the principal amount of a loan by combining the loan with loan-related services, such as credit insurance, that the borrower does not want"); Assocs. Home Equity Servs., Inc. v. Troup, 343 N.J.Super. 254, 278–79, 778 A.2d 529 (App.Div.2001) (noting that reasonable jury could find that consumer credit practices of defendants constituted unconscionable business practices), the

CFA's reach is not unbounded. Courts have "recognized a need to place reasonable limits upon the operation of the [CFA] 'despite broad statutory language, so that its enforcement properly reflects legislative intent, however ascertained.'" *DiBernardo v. Mosley*, 206 *N.J.Super.* 371, 375, 502 *A.*2d 1166 (App.Div.), *certif. denied*, 103 *N.J.* 503, 511 *A.*2d 673 (1986) (quoting *Jones v. Sportelli*, 166 *N.J.Super.* 383, 388, 399 *A.*2d 1047 (Law Div.1979)).

Based on our examination of legislative intent, we conclude that the CFA was not meant to reach the sale of securities and that that limitation prevents plaintiff from characterizing Mack's alleged abhorrent behavior as a "service" connected with the sale of securities. After all, any transaction involving "merchandise" (whether CFA-covered or not) would involve the "service" of providing the merchandise; and, therefore, permitting CFA liability for "services" in connection with items that are not "merchandise" under the CFA would effectively provide an end-run around the statutory definition of "merchandise." That would render the definition of "merchandise" in the CFA superfluous and make the CFA's breadth limitless. Conversely, our interpretation does not render the term "services" superfluous because we are finding it limited in the context of an excluded category of "merchandise." When an entire category of items, such as securities, is intentionally excluded from the definition of "merchandise" under the CFA, the service of selling that item is an inseparable component of the marketplace for that item.

### C.

Our holding renders unnecessary any consideration of the learned professionals exception that has been recognized in case law involving the CFA. That exception is a judicially crafted rule, whereby certain transactions fall outside the CFA's purview because they involve services provided by learned professionals in their professional capacity. *See, e.g., Macedo, supra,* 178 *N.J.* at 346, 840 *A.*2d 238 (physicians' services insulated from CFA); *Plemmons v. Blue Chip Ins. Servs., Inc.,* 387 *N.J.Super.* 551, 556,

904 A.2d 825 (App.Div.2006) (same for insurance brokers' services); *Vort v. Hollander*, 257 *N.J.Super.* 56, 62, 607 A.2d 1339 (App.Div.) (same for attorneys' services), *certif. denied*, 130 *N.J.* 599, 617 A.2d 1221 (1992); *Neveroski, supra*, 141 *N.J.Super.* at 379, 358 A.2d 473 ("Certainly no one would argue that a member of any of the learned professions is subject to the provisions of the [CFA] despite the fact that he renders 'services' to the public.").

The rationale underlying the learned professionals exception is that uniform regulation of an occupation, where such regulation exists, could conflict with regulation under the CFA. *See Daaleman v. Elizabethtown Gas Co.*, 77 *N.J.* 267, 272, 390 A.2d 566 (1978). Although that rationale might further buttress our result based on our conclusion that the Legislature intended to preclude securities from the CFA's reach, it is immaterial whether the judicially crafted learned professionals exception would otherwise apply to securities brokers.

## IV.

The judgment of the Appellate Division in respect of Count Two of plaintiff's complaint is reversed; the trial court's dismissal of that Count is reinstated; and the matter is remanded to the Law Division for further proceedings in respect of Count One of the complaint.

*For reversal, reinstatement and remandment*—Chief Justice RABNER and Justices LONG, LaVECCHIA, WALLACE, RIVERA–SOTO and HOENS—6.

*Opposed*—None.