988 A.2d 567 (2010)
411 N.J. Super. 582
Blanca GONZALEZ, Plaintiff-Appellant,
v.
WILSHIRE CREDIT CORPORATION and U.S. Bank National Association, as Trustee Under the Pooling and Servicing Agreement dated March 14, 1997 for Cityscape Home Equity Loan Trust 1997-B, Inc., Defendants-Respondents.
Docket No. A-2634-08T2
Superior Court of New Jersey, Appellate Division.
Argued October 21, 2009.
Decided February 1, 2010.
*568 Madeline L. Houston, argued the cause for appellant (Houston & Totaro, Bloomfield attorneys; Ms. Houston and Melissa J. Totaro, on the brief).
Richard P. Haber, argued the cause for respondents (McElroy, Deutsch, Mulvaney & Carpenter, LLP, Morristown, attorneys; Mr. Haber, of counsel and on the brief).
Before Judges CUFF, PAYNE and MINIMAN.
The opinion of the court was delivered by
PAYNE, J.A.D.
Plaintiff, Blanca Gonzalez, a non-debtor mortgagor, appeals from an order of summary judgment entered in favor of defendants Wilshire Credit Corporation and U.S. Bank National Association, as Trustee Under the Pooling and Servicing Agreement dated March 14, 1997 for Cityscape Home Equity Loan Trust 1997-B, Inc. (collectively, Wilshire), on her claim for damages pursuant to the Consumer Fraud Act (CFA), N.J.S.A. 56:8-1 to -106.

I.
The facts of the matter follow. Gonzalez and Monserate Diaz purchased a home in Perth Amboy on November 28, 1994. On February 26, 1997, Diaz obtained a loan of $72,000 from Cityscape Mortgage Corp., executing as "borrower" a fixed-rate balloon note in Cityscape's favor that indicated an interest rate of 11.25% and required monthly payments of $699.31 until March 3, 2012 when a final balloon payment of $61,384.17 would become due. Gonzalez did not sign the note. However, on February 26, she, along with Diaz, executed a mortgage on their joint residence as security for the debt, together with a balloon mortgage rider that acknowledged that Cityscape had no obligation to refinance its loan at the time that the balloon payment became due. The loan was assigned by Cityscape to U.S. Bank National Association, as trustee, under a pooling and servicing agreement, dated March 14, 1997, for Cityscape Home Equity Loan Trust 1997-B. U.S. Bank, in turn, appointed Wilshire as its servicing agent. The record contains the certification of John Thomas, in-house counsel and assistant vice-president of Wilshire stating that Gonzalez's creditworthiness was not evaluated in connection with the underwriting or origination of the loan, the loan's payment history was not reported to credit agencies under Gonzalez's name or social security number, and she "can not be held personally liable for payment under the *569 Note or be sued in connection with same, either in a direct action on the Note or [in] a post-foreclosure deficiency action."
On May 4, 1999, Diaz died intestate. The loan went into default. A foreclosure action was instituted on January 15, 2003 naming Diaz and "Mrs. Diaz" as defendants. An amended foreclosure complaint was filed on March 5, 2003 naming Gonzalez as one of the defendants. Gonzalez answered the complaint through counsel, Gail Chester. After motion practice, an order was entered requiring that Wilshire provide to Gonzalez the notice of intent to foreclose required by the Fair Foreclosure Act,[1]see N.J.S.A. 2A:50-57, and it was sent to her on September 10, 2003. Gonzalez was unable to cure the default, and on December 19, 2003, her answer was stricken, a default was entered against her, and the matter was transferred to the Foreclosure Unit of the Superior Court to proceed as an uncontested matter. A final judgment of foreclosure was entered on April 16, 2004 fixing the amount due at $80,454.71 plus interest and costs. A writ of execution was issued on the same day, and a sheriff's sale was scheduled.
Following the entry of the judgment of foreclosure but before a sheriff's sale had taken place, as the result of negotiations between counsel, on or about May 10, 2004, Wilshire and Gonzalez entered into a "stipulation of payment arrangement," which provided:
1. Defendant(s) acknowledges that his/her/their mortgage is in default and that a foreclosure action has been instituted on behalf of the plaintiff.
2. The present monthly payment is the sum of $699.31.
NOW THEREFORE, in consideration of mutual benefits to be derived thereby, the parties hereto agree as follows:
1. The mortgage account is presently in arrears, including the MAY payment as follows:

 ARREARAGES DUE TO WILSHIRE CREDIT
 CORPORATION INCLUDING MAY 2004
 PAYMENT AND FORECLOSURE
 FEES AND COSTS: $17,612.84
 TOTAL ARREARAGES AS OF MAY 10,
 2004 $17,612.84

2. The delinquency and costs will be paid as follows:
A lump sum payment in the sum of $11,000.00 payable to the order of WILSHIRE CREDIT CORPORATION due at this office on or before MAY 19, 2004. ...
Commencing JUNE 20, 2004 and on the 20th day of each month thereafter, through and including JANUARY 20, 2006 the sum of $1,150.00 per month will be paid by the mortgagors in certified funds directly to WILSHIRE CREDIT CORPORATION.
THIS TERM MAY NOT REINSTATE THE LOAN AND WILSHIRE CREDIT CORPORATION SHALL RETAIN SOLE DISCRETION TO EXTEND THE REPAYMENT PERIOD OR APPROVE OTHER WORKOUT OPTIONS, IF ANY.
* * *
3. When the account is fully current, plaintiff will dismiss the foreclosure action and discharge the Notice of Lis Pendens, provided there is no default declared by plaintiff and provided mortgagors obtain the consent of all attorneys who filed answers in the foreclosure action.
Gonzalez made the lump-sum payment of $11,000 and twelve of the fifteen payments due between June 3, 2004 and August 3, 2005. Her September 2005 payment *570 was refused by Wilshire and, because of the missed payments, a second sheriff's sale was scheduled for October 12, 2005.
Before the sheriff's sale occurred, on October 6, 2005, Gonzalez, who was not represented by counsel and allegedly has a sixth-grade education and does not speak English,[2] entered into a second stipulation of payment arrangement, which again noted that the subject mortgage was in default, a foreclosure action had been instituted, the "present regular monthly payment is the sum of $699.31," and that total arrearages as of October 5, 2005 were $10,858.18. The agreement required a lump-sum payment of $2,200 by October 11, 2005 and monthly payments of $1,000 for the following year, commencing on November 20, 2005.[3] Like the prior agreement, the October stipulation stated that "[w]hen the account is fully current, plaintiff will dismiss the foreclosure action and discharge the Notice of Lis Pendens, provided there is no default declared by plaintiff."
The record contains a certification by Gail Chester, Gonzalez's then-attorney, who stated that she was not informed of the October 2005 agreement until a year later. Additionally, she certified that when she questioned Wilshire regarding its arrearage calculation, its representative "could not explain how [Gonzalez] could have owed $10,856.18 in October of 2005[, n]or could he explain why Ms. Gonzalez was not deemed current and indeed ahead on her mortgage payments. ..."[4]
On July 23, 2007, Gonzalez, represented by present counsel, filed suit against Wilshire alleging consumer fraud pursuant to the CFA, consisting of improper calculation of arrears in connection with the October 2005 agreement; the inclusion in arrears of fees, costs and charges that were prohibited by law; improper direct contact with a non-English-speaking mortgagor known to be represented by counsel; improper failure to vacate the judgment of foreclosure; and a continuing practice of seeking to collect and demanding payments that were not due and owing through default notices and yearly repayment agreements.[5] Gonzalez also accused Wilshire of force-placing insurance after having been provided with competent evidence that she maintained such insurance throughout the period from March 2004 to March 2009, a practice known as loan packing.
Following a period of discovery in the case, the parties filed cross-motions for summary judgment. Wilshire's motion was granted. In a written decision filed on December 16, 2008, the motion judge focused on Wilshire's argument that Gonzalez was not a consumer in her dealings *571 with it. In that regard, the judge quoted at length from our opinion in Papergraphics Int'l, Inc. v. Correa, 389 N.J.Super. 8, 910 A.2d 625 (App.Div.2006), a case in which we held the bulk sale of counterfeit laser jet ink cartridges for resale was not covered by the CFA, citing multiple decisions involving commercial transactions in support of that conclusion. The judge then concluded:
This Court finds that Plaintiff cannot prevail as a matter of law because her CFA claim relates to one or both of the post-judgment settlement agreements entered into to stave off a foreclosure sale. With respect to those agreements, Gonzalez was a litigant who entered into a settlement with her adversary which enabled her to hold off the foreclosure sale thereby preserving her ownership interest and possession of the Property. It is evident from the aforementioned cases, history, and plain language of the CFA, that the Legislature never intended the Act to apply to settlement agreements entered into by parties to a lawsuit. Expanding CFA liability to cover litigation settlements would have a chilling effect on the settlement of lawsuits.
The appropriate mechanism for Plaintiff to seek relief is to file a motion to vacate, modify, or enforce the settlement at issue but not a separate action under the CFA. Plaintiff's motives in filing this action are transparent  the potential ability to win treble damages and attorneys' fees. Allowing this CFA case to proceed would undermine the settlement of foreclosure actions and potentially the settlement of all lawsuits.
This appeal followed.

II.
As background to our analysis of this matter, we note that when enacting the Fair Foreclosure Act, the Legislature found and declared
it to be the public policy of this State that homeowners should be given every opportunity to pay their home mortgages, and thus keep their homes; and that lenders will be benefited when residential mortgage debtors cure their defaults and return defaulted residential mortgage loans to performing status.
[N.J.S.A. 2A:50-54.]
Pursuant to that Act, at least thirty days prior to the filing of a complaint in foreclosure, a mortgage debtor must be given a written notice, among other things, of the intent to foreclose, stating the obligation or real estate security interest; the nature of the default claimed; the right of the debtor to cure the default; the sum of money and interest required to cure the default; the date by which the default must be cured to avoid institution of foreclosure proceedings; and the right to cure after foreclosure proceedings have been commenced. N.J.S.A. 2A:50-56. As stated previously, Wilshire was ordered to serve this notice on Gonzalez. Further, N.J.S.A. 2A:50-57 provides that the debtor "shall have the right at any time, up to the entry of final judgment ... to cure the default." As contrasted to redemption, which requires payment in full of the mortgage obligation,
"cure" refers to the right of the mortgagor (or debtor) to pay arrearages (i.e., overdue payments, late charges and other overdue amounts), thereby curing the default, bringing the loan current and "reinstating" the mortgagor's rights under the mortgage, which ordinarily gives the mortgagor the right to resume monthly installment payments where applicable. Because the right to cure ordinarily involves a much lesser sum than the right to pay the mortgage debt in full, it is an extremely valuable right for *572 the mortgage debtor and should not be confused with redemption.
[30 New Jersey Practice, Law of Mortgages § 20.2 at 8 (Myron C. Weinstein) (2d ed. 2000).]
The transactions at issue in this matter are not covered by the Fair Foreclosure Act, which protects only a "residential mortgage debtor," defined in N.J.S.A. 2A:50-55 as "any person shown on the record of the residential mortgage lender as being obligated to pay the obligation secured by the residential mortgage."[6] Further, the agreements at issue here were executed following entry of the judgment of foreclosure.
Nonetheless, the stipulation of payment agreements, in their form, are identical to cure and reinstatement agreements  a fact that we find relevant to our analysis of the applicability of the CFA to transactions between Gonzalez and Wilshire. By those agreements, Gonzalez undertook to cure the defaults in payment of the loan issued to Diaz, in exchange for Wilshire's agreement to vacate the judgment of foreclosure if, in fact, full performance by Gonzalez of the cure agreement occurred. While Gonzalez does not challenge the underlying structure of the agreements, in essence she claims that Wilshire committed consumer fraud in calculating the amounts due transforming, as the result of the terms of annually or biannually renegotiated agreements, a default curing obligation into a never-terminating cash cow. Because this appeal arises from the motion judge's dismissal of Gonzalez's CFA claim for failure to state a claim upon which relief can be granted, we review the legal issues raised herein on the assumption that the facts, as alleged by plaintiff, are true. Lemelledo v. Beneficial Mgmt. Corp. of Am., 150 N.J. 255, 263, 696 A.2d 546 (1997).
With these circumstances in mind, we turn to the CFA to determine whether coverage pursuant to that Act exists. That Act, enacted by the Legislature fifty years ago, created "a powerful weapon to curb consumer fraud." Lee v. First Union Nat'l Bank, 199 N.J. 251, 257, 971 A.2d 1054 (2009). "Its purpose is to `eliminat[e] sharp practices and dealings in the marketing of merchandise and real estate.' Channel Cos. v. Britton, 167 N.J.Super. 417, 418, 400 A.2d 1221 (App.Div.1979); see also Real v. Radir Wheels, Inc., 198 N.J. 511, 514, 969 A.2d 1069 (2009) (recognizing that CFA `represents a legislative broadside against unsavory commercial practices')." Lee, supra, 199 N.J. at 257, 971 A.2d 1054. Accordingly, N.J.S.A. 56:8-2 provides:
The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived *573 or damaged thereby, is declared to be an unlawful practice. ...
The CFA defines "merchandise" as "any objects, wares, goods, commodities, services or anything offered, directly or indirectly to the public for sale." N.J.S.A. 56:8-1(c). The Act further defines "advertisement" as
the attempt directly or indirectly by publication, dissemination, solicitation, indorsement or circulation or in any other way to induce directly or indirectly any person to enter or not enter into any obligation or acquire any title or interest in any merchandise or to increase the consumption thereof or to make any loan. ...
[N.J.S.A. 56:8-1(a).]
In light of the language of the CFA, which demonstrates "a clear legislative intent that its provisions be applied broadly in order to accomplish its remedial purpose, namely, to root out consumer fraud," Lemelledo, supra, 150 N.J. at 264, 696 A.2d 546, these prohibitions and definitions have been found to encompass lenders engaged in alleged loan packing, consisting of force placing insurance at the expense of one taking out a loan. Id. at 266, 696 A.2d 546 (holding that: "Because the broad language of the CFA appears to include both lending and insurance-sales practices, we conclude that its terms also include the sale of insurance in conjunction with lending, that is, loan packing."). As the Court stated:
By its terms, the CFA is applicable to the provision of credit. It specifically includes loans in its definition of what constitutes an "advertisement." N.J.S.A. 56:8-1(a). Moreover, its definition of "merchandise" as "anything offered, directly or indirectly to the public for sale" is more than sufficiently broad to include the sale of credit. See Tuxedo Beach Club v. City Federal Savings Bank, 749 F.Supp. 635, 649 n. 13 (D.N.J. 1990). Given the broad language of the CFA, we conclude that its terms apply to the offering, sale, or provision of consumer credit.
[Lemelledo, supra, 150 N.J. at 265, 696 A.2d 546.]
See also Associates Home Eq. Serv's v. Troup, 343 N.J.Super. 254, 778 A.2d 529 (App.Div.2001). There, among other things, we reversed an order of summary judgment dismissing plaintiffs' consumer fraud claims against the assignee of their mortgage loan and their contractor, finding that plaintiffs' mortgage loan was covered by the CFA's definitions of merchandise and advertisement as interpreted in Lemelledo, and that plaintiffs' claim that the lender had engaged in an unconscionable commercial practice in violation of N.J.S.A. 56:8-2 was for a jury to decide. Id. at 278, 778 A.2d 529. We held:
The word "unconscionable" must be interpreted liberally so as to effectuate the public purpose of the CFA. Kugler v. Romain, 58 N.J. 522, 543, 279 A.2d 640 (1971). It is not intended to "erase the doctrine of freedom of contract, but to make realistic the assumption of the law that the agreement has resulted from real bargaining between parties who had freedom of choice and understanding and ability to negotiate in a meaningful fashion." Id. at 544, 279 A.2d 640. The standard of conduct contemplated by the unconscionability clause is "good faith, honesty in fact and observance of fair dealing [,]" and the need for application of that standard "is most acute when the professional seller is seeking the trade of those most subject to exploitation  the uneducated, the inexperienced and the people of low incomes." Ibid. Whether a particular practice is unconscionable must be determined on a case-by-case basis. Id. at 543, 279 A.2d 640.

*574 [Troup, supra, 343 N.J.Super. at 278, 778 A.2d 529.]
See also Jefferson Loan Co. v. Session, 397 N.J.Super. 520, 938 A.2d 169 (App.Div. 2008) (holding CFA applicable to the post-repossession conduct of assignee of retail installment auto sales contract).
We acknowledge that the transactions at issue in this case did not directly involve the original mortgage loan but, instead, agreements to cure default between a mortgagor who was not a party to that loan and the assignee and servicer of that loan.[7] However, as the Lemelledo Court observed: "the CFA could not possibly enumerate all, or even most, of the areas and practices that it covers without severely retarding its broad remedial power to root out fraud in its myriad, nefarious manifestations." Lemelledo, supra, 150 N.J. at 265, 696 A.2d 546 (citing Federal Trade Comm'n v. Sperry & Hutchinson Co., 405 U.S. 233, 240, 92 S.Ct. 898, 903, 31 Ed.2d 170, 177 (1972)). Instead, the applicability of the CFA "hinges on the nature of a transaction, requiring a case by case analysis." Papergraphics, supra, 389 N.J.Super. at 13, 910 A.2d 625.[8] While we would hesitate greatly to hold that most "settlements" are subject to the CFA's strictures, we regard these particular agreements to be so closely allied to the cures of default recognized in N.J.S.A. 2A:50-57 as to warrant coverage. There is little doubt that, if Gonzalez had been the initial debtor and her attempts to cure default had taken place before entry of the order of foreclosure, the transactions would have been covered by the CFA under Lemelledo and Troup. We find no principled reason to distinguish the present structurally identical transactions, albeit by a non-debtor mortgagor, executed after a judgment of default had been entered.
The CFA offers a remedy to "[a]ny person who suffers any ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful under this act" and affords legal and equitable relief, treble damages and reasonable attorneys' fees to successful litigants. N.J.S.A. 56:8-19. We find that Gonzalez' status as a signatory to the agreements to cure default entered with Wilshire provides her with standing under the CFA. In the circumstances presented, Wilshire's arguments regarding the lack of privity between Gonzalez and Wilshire arising from the making of the initial loan and the issue of her status as a "consumer" of that loan are irrelevant.[9] A separate contractual relationship between Gonzalez and Wilshire exists that involves the loan, but does not arise directly from it. Further, we find *575 that the monetary damages that Gonzalez claims to exist as the result of Wilshire's allegedly unconscionable practices, if proven, constitute the statutorily-required "ascertainable loss." Weinberg v. Sprint, Corp., 173 N.J. 233, 237, 801 A.2d 281 (2002) (holding that to have standing under the CFA, "a private party must plead a claim of ascertainable loss that is capable of surviving a motion for summary judgment.").
We disagree with the motion judge's conclusion that Gonzalez could obtain relief in this matter only by a motion to vacate, modify or enforce the "settlement" with Wilshire. Such a motion would not effectively address the unconscionable practices that Gonzalez claims to have occurred here. Moreover, contrary to the conclusion of the motion judge, we do not find the casting of this matter as a CFA claim to signify an improper motive on counsel's part. The remedies of treble damages and an award of attorneys' fees were created to address just such a circumstance as has allegedly arisen here. As the Court stated in Wanetick v. Gateway Mitsubishi, 163 N.J. 484, 750 A.2d 79 (2000): "two of the three main purposes of the Act are `to punish the wrongdoer through the award of treble damages, and, by way of the counsel fee provision, to attract competent counsel. ...'" Id. at 490, 750 A.2d 79 (quoting Lettenmaier v. Lube Connection, Inc., 162 N.J. 134, 139, 741 A.2d 591 (1999)). See also Cox v. Sears Roebuck & Co., 138 N.J. 2, 24-25, 647 A.2d 454 (1994); Sema v. Automall 46 Inc., 384 N.J.Super. 145, 151, 894 A.2d 77 (App.Div.2006).
We thus conclude that Gonzalez has offered sufficient factual evidence of unconscionable conduct on the part of Wilshire to withstand a motion for summary judgment Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995), and that the motion judge was mistaken in his determination that the CFA is inapplicable to her claim. Manalapan Realty v. Manalapan Tp. Comm., 140 N.J. 366, 378, 658 A.2d 1230 (1995).
Reversed.
NOTES
[1] N.J.S.A. 2A:50-53 to -68.
[2] Wilshire's documents reflect its knowledge that Gonzalez was on a fixed income of $600 per month and that she does not speak English, making negotiations difficult.
[3] The agreement stated: "MOST STIPULATED AGREEMENTS WILL BE FOR A TERM OF 24 MONTHS OR LESS. THIS TERM MAY NOT REINSTATE THE DEFAULT." We presume that Wilshire intended the agreement to state the "LOAN," not the "DEFAULT."
[4] In his opinion granting summary judgment, the motion judge repeated a claim by Gonzalez that, by including a payment for October 2005 (not yet due at the time of the agreement) and taking into consideration late charges, she remained in arrears by $6,461.89, not the figure calculated by Wilshire. That sum is consistent with the sum expressed in Gonzalez's statement of material facts in opposition to Wilshire's motion for summary judgment.
[5] The record contains additional offers of reinstatement by Wilshire dated November 29, 2006, listing a "Reinstatement Amount" of $3,196.89, and dated January 31, 2007, listing a reinstatement amount of $2,495.51.
[6] Weinstein has observed:

Where the debtor has no personal liability... in the first place, there is no debtor under the act. This is anomalous because all homeowner rights and protections under the act are expressly given to the "debtor," not the "mortgagor" or "owner," and the debtor may not even be the homeowner. Without a "debtor," the application of many rights and protections under the act become uncertain or nonexistent. This is also inconsistent with the stated purpose of the act which is to protect the residential homeowner.
[30 New Jersey Practice, supra, § 24.10 at 258-59.]
[7] The stipulated payment agreements were unquestionably contracts. Brundage v. Estate of Carambio, 195 N.J. 575, 600-01, 951 A.2d 947 (2008); Pascarella v. Bruck, 190 N.J.Super. 118, 124-25, 462 A.2d 186 (App.Div.), certif. denied, 94 N.J. 600, 468 A.2d 233 (1983).
[8] We note in this regard that the transactions at issue in the cases cited in Papergraphics as falling outside of the protections of the CFA, id. at 13-14, 910 A.2d 625, are commercial in nature and bear no resemblance to the present consumer-lender agreements.
[9] Further, we note that privity is not a condition precedent to recovery under the CFA. Neveroski v. Blair, 141 N.J.Super. 365, 376, 358 A.2d 473 (App.Div. 1976); see also Perth Amboy Iron Works, Inc. v. Am. Home Assurance Co., 226 N.J.Super. 200, 211, 543 A.2d 1020 (App.Div. 1988) (observing, when applying CFA to a remote supplier, "[w]e see no reason to limit [the trend of abandoning privity requirements] in the application of the [CFA], especially where the Legislature has used expansively the term `indirectly' in defining the scope of the Act's coverage."), aff'd, 118 N.J. 249, 571 A.2d 294 (1990).